**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Onyx Renewable Partners L.P. *Plaintiff*, v. Hilary Kao *Defendant*. | Civil Action No. 22-cv-3720 Electronically Filed Complaint |

Onyx Renewable Partners L.P. ("Onyx" or "Plaintiff"), by and through its undersigned

counsel, brings this civil action against Hilary Kao ("H. Kao" or "Defendant") and respectfully

states as follows:

## I.     INTRODUCTION

1.      This is an action to hold accountable and recover damages against Onyx's former

General Counsel, H. Kao, who surreptitiously downloaded and transferred to his personal devices

over 10,000 of Onyx's confidential, privileged and proprietary documents in the two days before

his voluntary departure from Onyx.

2.      H. Kao's acquisition, use and failure to return these documents to Onyx is a

violation of the terms of his Employment Agreement.  These actions also constitute a breach of

his fiduciary obligations, along with a breach of his ethical obligations to Onyx as the former

General Counsel of Onyx.

3.      Since his employment with Onyx ended, H. Kao continued to retain and, upon

information and belief, use these documents despite Onyx's repeated requests to return the

documents.

1

4.      On April 26, 2022, H. Kao's spouse and former co-worker, Ja Kao ("J. Kao"), announced that she would lead a new solar energy development partnership for the development and financing of commercial and industrial solar energy projects.  This new venture will directly compete with Onyx.

5.      Onyx brings this action to prevent the further exploitation of its confidential and proprietary information by H. Kao and to hold him accountable and recover damages for breaches of his legal, contractual and ethical obligations to Onyx.

## II.      THE PARTIES

6.      Onyx is a clean energy provider and is a limited partnership formed under the laws of Delaware with its principal place of business at 230 Park Avenue, Suite 845, New York, NY 10169.

7.      H. Kao was appointed Onyx's interim general counsel in September 2017.  Upon information and belief, he resides in Pound Ridge, New York.

## III.      JURISDICTION AND VENUE

8.      The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      The Court has personal jurisdiction over H. Kao because upon information and belief he is a resident of New York.  Onyx has its headquarters in New York City and H. Kao's tortious conduct took place largely in New York.  H. Kao also agreed to submit to jurisdiction in New York in his Employment Agreement.

10.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Venue is otherwise proper in this District because H. Kao is subject to the personal jurisdiction of this Court and he

2

agreed that venue was proper in this District Court in his Employment Agreement.

## IV.    FACTUAL BACKGROUND

### A.  Onyx's Business

11.    Onyx was established in October 2014 to identify and develop North American solar projects in the commercial and industrial space.  In February 2021, entities managed by Sustainable Development Capital LLP ("SDCL") acquired a fifty-percent interest in Onyx.

12.    Onyx develops and finances commercial and industrial and small-scale utility solar energy projects.  Onyx provides comprehensive solutions for companies, governmental entities, and non-profits who wish to use solar energy projects to reduce their electrical consumption from utilities (thereby lowering their electrical bill) and reduce their greenhouse gas emissions.

13.    Onyx has developed solar energy systems throughout the United States including, for example, in California, Connecticut, New York and Virginia.

14.    In establishing a comprehensive suite of services to build and finance solar energy systems for customers, Onyx has devoted a tremendous amount of resources to develop trade secrets and other confidential and proprietary information.  These trade secrets include, but are not limited to, the financial models by which Onyx determines the commercial viability of solar projects; the financial models and documentation under which Onyx finances portfolios of solar energy systems and structures the purchase and sale of portfolios of solar energy systems; the engineering knowledge needed to draft plans for solar energy systems; Onyx's network of sub-contractors and suppliers; the operational knowledge needed to maximize the output of these solar energy systems; and Onyx's list of both current and potential customers.

15.    It is this set of trade secrets (and their accompanying confidential and proprietary information), developed over time and at significant expense, that gives Onyx an advantage over

a fast-growing set of competitors in the commercial, industrial, and small-scale utility space within the solar development industry.

**B.  H. Kao Joins Onyx As A Key Member Of Its Management Team**

16.      In September 2017, H. Kao was appointed interim General Counsel of Onyx at the recommendation of his wife, J. Kao, who was then the President of Onyx.  He became Onyx's permanent General Counsel in January 2019.

17.      As General Counsel, H. Kao was a member of Onyx's Executive Management Team and participated regularly in confidential strategy meetings with Onyx's CEO, CFO and COO.  H. Kao also regularly interacted with Onyx's Advisory Board and General Partner on many of Onyx's most sensitive and confidential matters.

18.      In his role as General Counsel, H. Kao supervised Onyx's Legal Department, which contained five people at its largest.

19.      As General Counsel, H. Kao was responsible for all of Onyx's legal matters and had access to and obtained both confidential and privileged information pertaining to such legal matters as well as pertaining to Onyx's business and prospective business operations.

20.      H. Kao was entrusted with managing some of Onyx's most important matters, including supervising the negotiation of all contracts related to Onyx's development of solar energy systems and the financing vehicles necessary to capitalize Onyx for the funding of such development.

21.      H. Kao also was responsible for supervising the drafting and revisions of Onyx's Limited Partnership Agreement and the Limited Liability Company Agreement of Black Onyx Investments, LLC, the carry vehicle for certain Onyx employees, along with ensuring that Onyx met its corporate governance obligations.

22.      In addition, H. Kao was responsible for supervising and advising Onyx with respect

4

to ongoing or threatened litigation and arbitration matters against Onyx.

23.     As its General Counsel, Onyx provided H. Kao access to its password protected and secure cloud dataroom.

24.     As a result, H. Kao had access to Onyx's confidential and proprietary information, including its trade secrets, as well as information and material subject to attorney-client and other applicable privileges.  These materials included, but are not limited to, all documentation for Onyx's solar development projects, business plans, financing documents, growth initiatives, potential strategic transactions, confidential employee information, litigation and historical legal records.

25.     Onyx entrusted H. Kao to protect its confidential and proprietary information to which he had unfettered access, subject to his obligations as an attorney and the terms of his Employment Agreement with Onyx.

**C.  H. Kao's Obligations to Onyx**

26.     On September 25, 2017, Onyx and H. Kao entered into an Employment, Confidentiality, and Non-Solicitation Agreement (the "Employment Agreement").

27.     H. Kao's Employment Agreement requires that he protect Onyx's Confidential Information from improper acquisition, disclosure or use and his adherence to this obligation was a condition of being hired and remaining employed by Onyx.

28.     H. Kao agreed in his Employment Agreement that Confidential Information included:

> the Company's financial data, scopes of production, customer/client data and names, marketing data, supplier information, selling methods, business strategies or initiatives, systems, processes, proprietary systems and/or processes, electronic technology, delivery and operational procedures, material agreements, strategic planning and similar matters, trade secret, process, research, report, technical data, know-how, computer program, software, technology, marketing or business plan, forecast, financial information, budget, license, employee and client lists, and any other information that the Company designates

as proprietary and confidential, as well as the terms and existence of this Agreement and the relationships created hereby. Confidential Information also refers to the reports, notes, compositions, formulations, methods and other technologies/systems/processes the Company and Employee have developed, whether or not said technologies/systems/processes have been incorporated within domestic and/or foreign patent, trademark, or copyright applications.

29.     Requiring that H. Kao agree to protect Onyx's Confidential Information as a condition of his employment is part of the reasonable efforts that Onyx undertakes to protect its Confidential Information.

30.     Indeed, H. Kao acknowledged through his Employment Agreement that his "relationship with [Onyx] is one of high trust and confidence and that in the course of [his] service to [Onyx] [he] will have access to Confidential Information belonging to [Onyx] and/or its client(s)."

31.     H. Kao also acknowledged that Onyx's Confidential Information, including all "inventions, discoveries, computer programs, data, technology, designs, innovations, processes and improvements, techniques, know-how and data . . . are the sole and exclusive property of [Onyx]."

32.     Likewise, Onyx's Employee Handbook states that Onyx's competitive advantage includes "a body of processes, procedures and methods of doing business that are valuable and proprietary." To protect this competitive advantage each employee must "not (i) reveal or disclose Confidential Information to any other person or third party, except to employees of the Company who have a need to know such Confidential Information in the course of performing his/her job responsibilities and pursuant to the consent and approval of the Company, and (ii) use any such Confidential Information for your personal use or advantage or make it available to others."

33.     To further protect Onyx's Confidential Information, H. Kao's Employment Agreement provides:

> Upon termination of the employment relationship for any reason whatsoever or at any other time upon request by Company, Employee shall promptly deliver to Company all Confidential Information (including copies, reproductions or otherwise containing Confidential Information whether in tangible or intangible form) including, but not limited to, records, files, memoranda, notes, designs, data, reports, price lists, customer lists, drawings, plans, computer programs, software, software documentation, sketches, laboratory and research notebooks and other documents (and all copies or reproductions of such materials) relating to the business of Company, the Employment relationship and/or Company's Clients.

34.     Likewise, Onyx's Employee Handbook requires that:

> Upon termination of the employment relationship for any reason whatsoever or at any other time upon request by the Company, you shall promptly deliver to the Company all Confidential Information (including copies, reproductions or otherwise containing Confidential Information whether in tangible or intangible form) relating to the business of the Company, the employment relationship and/or the Company's clients.

35.     In addition to his contractual and fiduciary obligations, H. Kao was also bound by ethical duties as a practicing lawyer to "not knowingly reveal confidential information." Rule 1.6 New York Rules of Professional Conduct. Upon departure, H. Kao would be required to promptly return all Confidential Information to Onyx. Rule 1.3(c) New York Rules of Professional Conduct (a "lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services").

### V.     H. Kao Breaches His Obligations To Onyx

36.     Through third-party forensic investigation, Onyx has now learned that H. Kao breached his fiduciary, ethical and contractual obligations to Onyx by improperly acquiring and using vast swaths of Onyx's Confidential Information.

### A.     H. Kao Improperly Acquires And Uses Onyx's Confidential And Proprietary Information As Both He and His Wife Resign From Onyx

37.     On April 23, 2021, J. Kao voluntarily tendered her resignation as President and CEO of Onyx.

38.     H. Kao submitted his own voluntary resignation on May 17, 2021.

39.     Two days before his resignation, H. Kao executed a brazen plan to download Onyx's most sensitive information from Onyx's dataroom.

40.     As the dataroom contains Onyx's most valuable trade secrets, it is username and password protected.

41.     Onyx employees are only given access to the portions of the dataroom that contain documents they need to perform their jobs.

42.     Due to his role as General Counsel, H. Kao had access to the complete dataroom.

43.     Onyx also regularly monitors use of its dataroom and investigates any unusual activity, including downloads of large volumes of documents.  Onyx learned of H. Kao's actions by reviewing the activity history of its dataroom and subsequently conducted a forensic review of H. Kao's Onyx laptops.

44.     On Saturday, May 15, 2021 (two days before his resignation) at approximately 8:51 pm, H. Kao plugged his personal Seagate External Storage Device (serial number msft30naa2gwfq) into his Onyx laptop.

45.     At approximately 8:58 pm, H. Kao began to download 10,507 files from Onyx's cloud-based dataroom hosted on Box – a secure cloud storage provider (the "Dataroom Documents").

46.     As reflected by the sheer volume of the Dataroom Documents downloaded, H. Kao misappropriated documents that reflect years of work by Onyx, thousands of person hours by Onyx employees and hundreds of thousands of dollars in fees paid to outside vendors for documents, such as, solar energy system engineering designs.

47.     Prior to his downloading activities on May 15, 2021, H. Kao had downloaded only *11 files* from the Onyx dataroom in all of 2021.

48.     Measured against his prior conduct, the volume of documents downloaded from the dataroom by H. Kao was highly anomalous.

49.     There was no work-related reason for H. Kao to download these documents.

50.     Many of these documents did not relate to H. Kao's legal function, and even as to those documents that did relate to H. Kao's work at Onyx, there was no justification for downloading these documents so close to his departure.

51.     H. Kao did not otherwise use the Dataroom Documents in any manner related to his work between his download of the documents on Saturday night and his resignation from Onyx Monday morning.

52.     The documents downloaded from the Onyx dataroom contain Onyx's confidential and proprietary information, including trade secrets, and qualify as Confidential Information under the terms of the Employment Agreement.

53.     The Dataroom Documents relate to numerous projects that have been developed and financed by Onyx throughout the United States, including confidential financial models, solar energy system designs, system performance reports, power purchase agreements with key customers, customer agreements, site control documents, tax equity financing agreements, and renewable energy incentive application documentation.

54.     The Dataroom Documents also relate to the highly confidential ways in which Onyx secures strategic capital for its core business, including highly negotiated documentations for its credit facilities, tax equity facilities and structured sales of Onyx-developed portfolios.

55.     For example, the files downloaded include "Onyx Portfolio Model_aaa.xlsm."[1] This spreadsheet includes a description of each solar energy system throughout multiple states

---

[1] To protect Onyx's confidential information, Onyx is anonymizing certain sensitive file names.

developed by Onyx within that particular investment portfolio. For each solar energy system, it lists the projected operating expenses for the solar energy system, the projected revenue from the solar energy system, the asset's depreciation and Onyx's projected profit from the solar energy system.

56. This information on the projected performance of each Onyx solar energy system is a competitive advantage for Onyx as Onyx has devoted years and countless hours of efforts to both identify and develop the solar energy systems in the portfolio and model the financial performance of those solar energy systems. In order to model the financial performance of a given solar energy system, the spreadsheet uses a proprietary set of formulas which reflect Onyx's years of experience in the solar energy business.

57. In addition to projecting Onyx's profit on a particular solar energy system, the model also projects the value of the portfolio of solar energy systems to tax equity investors. Valuing the return to tax equity investors requires the use of a sophisticated and proprietary financial model as energy-sector investments (particularly those based around renewable or alternative energy) implicate a host of potential revenue/support streams, including government subsidies, tax breaks, and other non-customer sources.

58. In addition to misappropriating the financial model contained in the "Onyx Portfolio Model_04.13.20_aaa.xlsm" spreadsheet, H. Kao misappropriated financial models for two other portfolios of Onyx solar energy systems and Onyx's debt finance model which itself includes models for four different financing structures.

59. A competitor could thus use the solar energy system and financial models that H. Kao misappropriated to gain a strategic advantage by leveraging Onyx's confidential and

proprietary information to develop competitive systems and models and to solicit potential investors.

60.     The information in the vast majority of the Dataroom Documents, including the financial models described above, is not in the public domain, was developed by Onyx at great effort and expense, including by incurring and paying substantial fees, and, in the hands of a competitor, would unfairly deprive Onyx of its competitive advantage.  For example, H. Kao misappropriated Onyx's power purchase agreements ("PPA").  These PPAs set out the identity of Onyx's customers and the exact commercial terms on which Onyx has contracted with its customers.  H. Kao could use the PPAs to undercut Onyx in any future negotiations with Onyx's customers on behalf of a competing business.

61.     The dissemination or misuse of the information would cause severe damage to Onyx's position and credibility in the marketplace.

62.     On the morning of May 17, 2021 (just hours before his resignation), H. Kao undertook the steps necessary to transfer the Dataroom Documents to his personal Seagate External Storage Device.

63.     Specifically, between approximately 8:56 and 9:10 am that day, H. Kao created or saved the following folders on his Seagate External Storage Device titled "Documents and Files," "Documents and Files\Backup – 2021.05.17," and "Documents and Files\downloads backup – 2021.05.17."

64.     Between approximately 8:43 am and 10:22 am that day, H. Kao extracted files from compressed zip folders titled "Onyx Renewable Partners Dataroom," "Transaction A," and "Transaction B."

65.     The names of these folders refer to the files H. Kao downloaded from the Onyx dataroom and various Onyx transactions.  The extraction of these files evidences that H. Kao did so as part of likely transferring the files from his Onyx laptop to the Seagate External Storage Device.

66.     At approximately 10:27 am, H. Kao submitted his resignation from Onyx, effective immediately.

67.     At approximately 10:29 am, H. Kao removed his Seagate External Storage Device from the Onyx laptop.

68.     This sequence of events strongly supports that H. Kao illicitly transferred the Dataroom Documents onto his Seagate External Storage Device.  Indeed, H. Kao created folders on his Seagate External Storage Device to store the Dataroom Documents and then extracted those Dataroom Documents from compressed zip files in order to transfer them onto the Seagate External Storage Device.  Only after he completed both of these steps – *and then resigned* – did H. Kao finally remove his Seagate External Storage Device from the Onyx laptop.

69.     H. Kao's browser history does not show any interactions with Box.com or onyxrenewablepartners.app.box.com between May 15 and his return of the Onyx laptops on July 3, 2021.  Absent H. Kao clearing his browser history or using private browsing to hide his activity, his visit to Box.com or onyxrenewablepartners.app.box.com would have been reflected in his browser history.

70.     That lack of interaction evidences that H. Kao likely cleared his browser history (or otherwise hid his browsing activity) in an attempt to hide his knowingly improper downloads.

71.     H. Kao has not returned the Dataroom Documents despite Onyx's repeated requests.

72.     H. Kao's unauthorized transfer of the Dataroom Documents breached his contractual, fiduciary and ethical obligations to Onyx.

73.     H. Kao's download and transfer of the over 10,000 Dataroom Documents onto a personal device was part of a larger and troubling pattern of his moving Onyx documents onto his personal external storage devices in the time period between J. Kao's notice of resignation on April 23, 2021 and his own resignation on May 17, 2021.

74.     For example, on May 2, 2021, H. Kao utilized a file on his Seagate External Storage Device titled "hk_backup\Finder!bbb.pst."

75.     PST files are typically used to store large volumes of Microsoft Outlook emails and the file name indicates that the folder likely contained the emails of a former Onyx executive.

76.     The emails in that file contained Onyx's most sensitive and restricted information, such as business plans, growth initiatives, potential strategic transactions, development opportunity lists, confidential employee information, and historical legal records.

77.     H. Kao never returned the documents in the file "hk_backup\Finder!bbb.pst" to Onyx.

78.     There is no justification for his retention of these documents.

79.     That same day H. Kao utilized the folders "hk_backup\hk_backup.pst" and "hk_backup\hk_archive.pst" on his Seagate External Storage Device.

80.     Again, the "PST" file format typically indicates that a large volume of emails are contained in a file.  Moreover, the fact that the PST file is named "hk_backup," which refers to H. Kao, evidences that H. Kao likely backed-up his Onyx email account to his Seagate External Storage Device.

81.     In another example, on May 8, 2021, H. Kao created or saved a folder on his personal storage device tilted "Closing Sets."  He then accessed a folder titled "Closing Sets - tax equity sale and financing\Sale – Transaction C" on his Onyx laptop.

82.     These actions strongly indicate that H. Kao transferred the 143 files in the folder "Closing Sets - tax equity sale and financing\Sale – Transaction C" to his external storage device with a folder of a similar name.

83.     The 143 documents in this folder constitute the documents related to Onyx's sale of its interest in various solar energy systems to an investment fund.  Many of these documents are labeled confidential, privileged and/or state that they contain financial or operational information.

84.     H. Kao's transfer of these Transaction C documents is particularly problematic because the Dataroom Documents contained the financial model which was used to project the value of Transaction C.  In the course of a week, H. Kao misappropriated those documents needed to conduct a sale of a portfolio of solar energy systems in different transaction structures and the various financial models which would underpin those different transaction structures.

85.     In sum, between when J. Kao announced her resignation from Onyx on April 23, 2021 and when H. Kao himself resigned on May 17, 2021, H. Kao systematically copied confidential, proprietary and/or privileged information belonging solely to Onyx to his personal devices without authorization, and he has unlawfully retained these Onyx documents following his resignation from Onyx.

86.     H. Kao's unauthorized transfer of the Onyx documents onto his personal devices violated Onyx's policy against "personal use" of Confidential Information and his retention of the Onyx documents violated his obligation to return Onyx's Confidential Information upon his departure from Onyx.

87.     After his resignation with immediate effect on May 17, 2021, H. Kao had no right to retain or use any of Onyx's trade secrets or other Confidential Information.

88.     Yet, H. Kao continued to access and use without authorization Onyx's confidential, proprietary and privileged documents on his work laptops after his resignation with immediate effect on May 17, 2021.

89.     He did so despite Onyx's efforts to obtain the return of H. Kao's work laptops.

90.     On June 6, 2021, H. Kao connected his Seagate External Storage Device to a second Onyx laptop that he had used while working for Onyx.  He then interacted with the folder "Desktop\My Computer\Documents\2019.12.30 All files backed up to h drive" on his Onyx laptop and subsequently interacted with the folder "hk_backup\backup – documents\2019.12.30 All files backed up to h drive" on his Seagate External Storage Device.

91.     These interactions evidence that some or all of the files within that folder were likely copied to the Seagate External Storage Device.

92.     That same day, H. Kao also interacted with the folder "hk_backup\backup – documents\Outlook Files" on his Seagate External Storage Device.

93.      Again, this interaction evidences that he likely retained and used the information he misappropriated from Onyx after his employment with Onyx ended.

94.     On June 8, 2021, H. Kao again accessed his second Onyx laptop and interacted with a series of files and folders related to a specific Onyx solar energy system.

95.     He then created or saved folders on his Seagate External Storage Device with names related to that same specific Onyx solar energy system.

96.     These interactions also evidence improper accessing and copying confidential and proprietary information belonging to Onyx from his Onyx laptop to his Seagate External Storage Device.

97.     On June 15, 2021, Onyx sent a letter to H. Kao requesting that he certify he had destroyed all Onyx Confidential Information and asking for the return of the work laptops.  This letter noted that under H. Kao's Employment Agreement he had an obligation to return all Confidential Information.  H. Kao did not respond to this request besides acknowledging having received the request.

98.     On July 1, 2021, Onyx again reached out to H. Kao asking him to return the Onyx property, including the Onyx laptops, and asking him to certify that he had deleted the Dataroom Documents.

99.     The very next day, July 2, 2021, H. Kao connected a Lexar External Device (serial number aa8sqt8fptphj8xv&0) to his primary Onyx laptop at approximately 12:50 pm.

100.    He then interacted with folders on this Onyx laptop titled "Desktop\My Computer\Documents\Employment Matters – all," "Documents\Employment Matters – all\Employment – general matters," and "Documents\ORP LPA and Resolutions\Files from Legal P drive 10-08-2019."

101.    On the second Onyx laptop, H. Kao interacted with a folder titled "Desktop\My Computer\Documents\2019.12.30 All files backed up to h drive\Personnel Matters – Legal."

102.    These interactions indicate that H. Kao was accessing and likely copying to his personal storage device confidential and privileged documents related to Onyx's employment matters and the Limited Partnership Agreement of Onyx and Onyx's General Partner Resolutions.

103.    Also, on July 2, 2021, H. Kao again accessed folders titled "Downloads\Onyx Renewable Partners Dataroom\Onyx Renewable Partners Dataroom" and "Documents\Transaction D – 2020\z.archive – Transaction D" on the primary Onyx laptop.

104.    These folder names refer to H. Kao's download of documents related to the Transaction D and the over 10,000 documents he downloaded from Onyx's dataroom.

105.    That H. Kao interacted with these files while his Lexar External Storage Device was connected to his Onyx laptop indicates additional files may have been copied to his Lexar External Storage Device.

106.    Also, on July 2, 2021, H. Kao interacted with folders already on his Lexar External Storage Device related to another legal matter involving Onyx and folders named for a specific Onyx solar energy system development.

107.    This evidences that the Onyx documents, including the Dataroom Documents, that H. Kao misappropriated were still in his possession and active use after his employment ended, in each case without authorization.

108.    On July 3, 2021, after his deliberate accessing and likely copying of Onyx's confidential, proprietary and privileged information (the "Onyx Materials") onto his personal external devices for an over two-month period, H. Kao shipped both Onyx laptops back to Onyx.

109.    H. Kao never certified that he destroyed the Onyx Materials, including the Dataroom Documents as requested, undoubtedly due the fact that his misconduct precluded him from doing so.

110.    Based on H. Kao's activities and conduct, H. Kao appears to believe that he is unrestrained in the retention, use, or disclosure of Onyx's confidential trade secret information for his own personal gain, for the benefit of a different company, or to otherwise harm Onyx.  Thus,

upon information and belief, when he transferred the Onyx Materials to his personal storage devices, H. Kao intended to use these documents to establish a business to compete with Onyx and/or to aid a business that was already competing with Onyx.

111.    That H. Kao intends to use these documents to compete – or assist his wife, J. Kao, in competing – with Onyx is supported by J. Kao's announcement on April 26, 2022 that she will lead 42 Renewables in its partnership with Fengate Distributed Generation Partners.

112.    Fengate Distributed Generation Partners is a new business venture that will directly compete with Onyx in acquiring, developing, constructing, and operating commercial and industrial solar energy products.

113.    Upon information and belief, J. Kao begins her leadership of this solar energy business with unfettered access to Onyx's trade secrets which form the building blocks of a solar energy business due to her husband's misappropriation of the Onyx Materials.

114.    In addition, on February 2, 2022, Kao Renewable Energy LLC was incorporated indicating that J. Kao, and likely H. Kao, have been actively working to establish a new business venture to compete with Onyx in the solar energy business.

**FIRST CLAIM**
**DEFEND TRADE SECRETS ACT**

115.    Onyx repeats and re-alleges each and every allegation contained in Paragraphs "1" through "114" herein.

116.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836.

117.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically...or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

118.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5).

119.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

120.    As set forth above, certain of the Onyx Materials, including documents downloaded from the Onyx dataroom, constitute trade secrets related to a product or service used in, or intended for use in, interstate commerce, including, but not limited to, Onyx's financial models, Onyx's projections of the revenue and costs of a solar energy system over its lifespan, Onyx's solar energy system designs, an inventory of all of Onyx's solar energy systems, and documentation that reflects all steps necessary to build, finance, operate and maintain a solar energy system.

121.    Onyx takes reasonable measures to protect the secrecy of such information. These measures include employee confidentiality, non-disclosure, restrictive covenant agreements; password-protected electronic devices and dataroom; maintaining such information on an intranet and dataroom that restricts employee access to those who have a reasonable need-to-know; and limitations on the dissemination of information on a need-to-know basis.

122.    In addition to his ethical obligations as the General Counsel of Onyx, H. Kao was subject to provisions in his Employment Agreement and the Onyx Employee Handbook designed to protect the proprietary and confidential nature of certain information belonging to Onyx. Among such provisions, the Onyx Employee Handbook prohibited H. Kao from "us[ing] any such Confidential Information for [his] personal use or advantage."

123.    H. Kao's Employment Agreement required that, upon his departure from Onyx, H. Kao return all Confidential Information to Onyx.

124.    Surreptitiously downloading the Onyx Materials, including the Dataroom Documents, and placing them on personal external storage devices was contrary to the terms of H. Kao's Employment Agreement and Onyx policy.

125.    The Onyx Materials H. Kao improperly possesses derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or use of the information.

126.   At no point did Onyx give H. Kao permission to download the Onyx Materials or transfer them to his external storage devices and H. Kao knew or should have known that these documents contained trade secrets belonging to Onyx.

127.   In violation of the DTSA, H. Kao has misappropriated or is threatening to misappropriate Onyx's confidential, proprietary, and trade secret information in the improper and unlawful manner described herein.

128.   In particular, H. Kao improperly acquired and/or used Onyx's trade secrets via his download of the Onyx Materials and transfer of those Onyx Materials to his personal devices.

129.   H. Kao further improperly acquired and/or used Onyx's trade secrets by accessing those trade secrets on his Onyx laptops after his employment with Onyx ended and transferring those trade secrets to his personal devices.

130.   Based on H. Kao's download of the Dataroom Documents just days before his resignation; H. Kao's efforts to obscure his actions by clearing his browser history; H. Kao's continued acquisition and use of Onyx's documents after his employment ended; and J. Kao's launching of a competitive business (Fengate Distributed Generation Partners), upon information and belief, H. Kao has used or intends to use these trade secrets for an improper purpose, including, but not limited to using these trade secrets to aid his wife in the competitive business she started.

131.   H. Kao's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, and malicious.

132.   H. Kao has injured Onyx by improperly acquiring its trade secrets, and his use of Onyx's trade secrets threatens Onyx in the extremely competitive market for the development of

solar energy systems.  In particular, the trade secrets acquired by H. Kao could be used as the building blocks for starting a new solar energy systems development business as they outline all the steps and financial considerations that go into a solar energy development.

133.    H. Kao has been unjustly enriched by his acquisition and use of Onyx's trade secrets.

134.    Onyx does not have an adequate remedy at law for H. Kao's improper acquisition and use of confidential and proprietary information, including its trade secrets.

135.    In the Employment Agreement, H. Kao agreed that injunctive relief was warranted for any breach of his Employment Agreement.

136.    As a result, H. Kao has violated the DTSA, Onyx has suffered damages, and Onyx is entitled to an award of equitable, compensatory, punitive and exemplary damages, in an amount to be determined at trial.

**SECOND CLAIM**
**BREACH OF FIDUCIARY DUTY**

137.    Onyx repeats and re-alleges each and every allegation contained in Paragraphs "1" through "114" herein.

138.    As General Counsel of Onyx, H. Kao owed Onyx fiduciary duties of loyalty, care and good faith.

139.    H. Kao breached these fiduciary duties by downloading and improperly using thousands of Onyx's confidential and proprietary files.

140.    In undertaking these actions, H. Kao placed the interests of himself above the interests of Onyx and breached his ethical obligations to Onyx.

141.    As a result of H. Kao's breach of his fiduciary duties, Onyx has suffered damages, and is entitled to an award of compensatory, punitive and exemplary damages, in an amount to be determined at trial.

**THIRD CLAIM**
**BREACH OF CONTRACT**

142.    Onyx repeats and re-alleges each and every allegation contained in Paragraphs "1" through "114" herein.

143.    H. Kao entered into the Employment Agreement and agreed that, among other things, he would return all Confidential Information to Onyx upon the termination of his employment.

144.    The Employment Agreement is a valid contract that exists between the parties.

145.    Onyx has substantially performed and complied with each of its obligations under the Employment Agreement.

146.    H. Kao breached his obligations under the Employment Agreement by copying Confidential Information onto his personal devices and then failing to return that Confidential Information to Onyx upon his departure from Onyx.

147.    H. Kao breached his obligations under the Employment Agreement by accessing and using Onyx's Confidential Information after his employment at Onyx ended.

148.    Onyx has also been injured by H. Kao's retention of the Confidential Information, and is entitled to the immediate return of all Confidential Information.

149.    In addition, the Employment Agreement provides that "Employee also agrees to reimburse the Company for all legal fees and expenses incurred by it to enforce any provision in this Agreement."

150.    Under the Employment Agreement, Onyx is entitled to the payment of its legal fees

and expenses to enforce its rights under the Employment Agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Onyx requests that this Court:

A.      Order specific performance of H. Kao's Employment Agreement in requiring H. Kao to return all Confidential Information to Onyx;

B.      Permanently enjoin H. Kao from disclosing or using Onyx's Confidential Information or privileged information;

C.      Award Onyx its attorney's fees and expenses pursuant to the DTSA (18 U.S.C. § 1836);

D.      Award Onyx its attorney's fees and expenses in this Action in accordance with Section 5 of H. Kao's Employment Agreement which provides "Employee also agrees to reimburse the Company for all legal fees and expenses incurred by it to enforce any provision in this Agreement;"

E.      Award Onyx any gains from H. Kao's wrongdoing;

F.      Award Onyx monetary damages, punitive damages, attorneys' fees, costs and prejudgment interest;

G.      Award Onyx such other relief as the Court deems just and proper.

Dated: New York, New York
        May 6, 2022

MORGAN, LEWIS & BOCKIUS LLP

By: */s/* David A. McManus
Melissa D. Hill
David A. McManus
Lucas D. Hakkenberg
101 Park Avenue
New York, New York 10178
Telephone:     212.309.6000
Facsimile:      212.309.6001
melissa.hill@morganlewis.com
dmcmanus@morganlewis.com
lucas.hakkenberg@morganlewis.com

Of Counsel:

Ben Jacobs
1701 Market Street
Philadelphia, Pennsylvania 19103
Telephone:     215.963.5000
Facsimile:      215.963.5001
benjamin.jacobs@morganlewis.com
*Pro Hac Vice Forthcoming*

Attorneys for Plaintiff
Onyx Renewable Partners L.P.