N1CConyO.

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ONYX RENEWABLE PARTNERS, L.P.,

4                   Plaintiff,

5           v.                          22 Civ. 3720 (RA)

6   HILARY KAO,

7                   Defendant.

8   ------------------------------x

                                        New York, N.Y.
9                                       January 12, 2023
                                        11:00 a.m.
10
    Before:
11
                        HON. RONNIE ABRAMS,
12
                                        District Judge
13
                        APPEARANCES
14
    MORGAN LEWIS & BOCKIUS LLP
15       Attorneys for Plaintiff
    BY:  BENJAMIN K. JACOBS
16       LUCAS D. HAKKENBERG

17  LANKLER SIFFERT & WOHL LLP
         Attorneys for Defendant
18  BY:  MATTHEW G. COOGAN
         BRICE JASTROW
19

20  ALSO PRESENT:

21       ALFRED WANG, Onyx Renewable Partners

22

23

24

25

N1CConyO.

```
1              (Case called)
2              MR. JACOBS:  Good morning, your Honor.  Benjamin
3    Jacobs for plaintiff.
4              MR. HAKKENBERG:  Good morning, your Honor.  Lucas
5    Hakkenberg for plaintiff, from Morgan Lewis & Bockius.
6              MR. WANG:  Alfred Wang, general counsel, Onyx
7    Renewable Partners.
8              MR. COOGAN:  Good morning, your Honor.  Matthew
9    Coogan, Lankler Siffert & Wohl LLP, for the defendant, Hilary
10   Kao.
11             THE COURT:  Good morning.
12             MR. JASTROW:  Brice Jastrow for defendant Hilary Kao.
13             THE COURT:  Good morning.  We're here for oral
14   argument today on defendant's motion to dismiss.  I note
15   defendant requested oral argument, and since it's your motion,
16   I'll hear from defendants first.
17             MR. COOGAN:  Thank you, your Honor.  My client wanted
18   me to pass along his regrets that he could not be here, he very
19   much wanted to be, but he has come down with strep throat,
20   unfortunately, and is sort of coughing profusely.
21             THE COURT:  No worries.  Thanks.  I'm going to ask you
22   and actually everyone, and I'm going to do the same, to speak
23   into the microphone.  You're welcome to stay at the desk,
24   you're welcome to go to the podium just as long as I can hear
25   you.
```

N1CConyO.

1          MR. COOGAN:  Is that better?

2          THE COURT:  Thank you.  It is.

3          MR. COOGAN:  Your Honor, if it's acceptable to the

4    Court, there are essentially three claims, three bases of our

5    motion broadly.  I plan to handle the DTSA claim.  My

6    colleague, Mr. Jastrow, who is an associate at my firm, is

7    going to handle the fiduciary duty and contract claims,

8    assuming that is okay with your Honor.

9          THE COURT:  Absolutely.  Thank you.

10          MR. COOGAN:  Thank you.  I know we explained a lot of

11    the background in our papers.  I want to just sort of cover

12    some high-level pieces that I think is sort of relevant to

13    where we're situated today.

14          Mr. Kao is a practicing lawyer.  He has been a

15    practicing lawyer for about 25 years.  He graduated from

16    Georgetown Law School in 1998, worked as a tax lawyer at

17    Milbank, and then joined the faculty of Ohio University School

18    of Law before joining Onyx.  He served as outside counsel for

19    Onyx from 2015 until roughly September of 2017.  In September

20    of 2017, he was hired by Onyx as the interim general counsel, a

21    title he held until, it is alleged, January of 2019 when the

22    interim title was dropped and he maintained the general counsel

23    title.  Over all that time, he has an unblemished record, as we

24    explained in our papers, and we submitted his certificate of

25    good standing.

N1CConyO.

1          The plaintiff's allegations here of theft of a

2     client's trade secrets have essentially rendered him

3     unemployable.  The trade presses picked it up.  He hasn't

4     worked since the litigation was filed.  Onyx has denied, we

5     believe wrongfully, advancement of defense costs on the ground

6     that the fiduciary duty claim, which is claim No. 2 in the

7     complaint, is currently pending against him.

8          So the lawsuit is an extreme burden on him,

9     economically, reputationally, and personally.  We believe, I

10    will not belabor it, but we believe this case was filed over a

11    year after or roughly a year after the events at issue in an

12    order to gain some advantage and leverage in a related state

13    case that makes the same factual allegations as this case makes

14    in terms of the download of the roughly 10,500 documents.

15         Both Mr. Kao and his wife worked for Onyx for roughly

16    six years.  Ja Kao, who is the wife, was hired in 2015.  As

17    president, she later took the additional title of CEO.  She

18    held that position, was successful in it, et cetera, until the

19    spring of 2021.

20         And what sort of precipitated the adversity here is

21    that Onyx was owned by Blackstone 100 percent until early 2021,

22    February of 2021, when a transaction was consummated in which

23    Blackstone sold off 50 percent of the entity to a London

24    investment company called SEEIT.

25         Essentially, Ja Kao, Mr. Kao's wife, saw her

N1CConyO.

```
1    responsibilities diminished.  There was some friction with the
2    new executives that came in and she decided to resign.  She
3    tendered her resignation on April 23rd, 2021, or tendered a
4    notice of intent to resign on April 23rd, 2021, effective
5    June 22nd of 2021, which was a notice period that was provided
6    by her employment agreement.  Over the following week, she
7    attempted to negotiate a friendly exit.  That, around the third
8    week of May, became untenable.  The relationship got quite
9    adversarial in July of 2021, she filed suit against Onyx and
10   the rest is history.
11           When Ms. Kao, Hilary's wife, tendered her notice of
12   intent to resign, Mr. Kao intended to remain on the job.  He
13   liked the job.  The expectation was he would continue serving
14   as general counsel.  That changed on the morning of May 17th,
15   2021, as evidenced by the document that we -- well, as
16   evidenced by the complaint, but also the document that we
17   submitted attached to my declaration where he submitted a
18   resignation with immediate effect at roughly 10:30 in the
19   morning on October 17th of 2021.  He did that because he became
20   aware of a communication that his wife intended to send to the
21   principal of the general partner of Onyx who was negotiating
22   the separation agreement or attempting to negotiate the
23   separation agreement.  He concluded, as is stated in the
24   document, that he was disabled under the New York Professional
25   Rules from continuing to represent the company given the
```

N1CConyO.

1    adversity that he expected to realize imminently between the

2    company and his wife.

3        Two days earlier, on May 15th of 2021, Mr. Kao

4    downloaded a trove, for lack of a better word, of documents,

5    according to the complaint, 10,507 documents.  It was roughly

6    8:00 p.m. when that occurred.  What the complaint alleges is

7    that Mr. Kao had an Onyx-issued laptop, so company property,

8    that there was some forensic evidence on that laptop that he

9    plugged a -- what the complaint calls personal external hard

10   drive into the laptop, and about seven to ten minutes later,

11   initiated a download which resulted in these little bit over

12   10,000 documents being downloaded to the company laptop.

13       I'm hesitant to get into sort of central facts about

14   this event and belabor facts --

15       THE COURT:  I, of course, have to assume all the

16   allegations in the complaint as true.

17       MR. COOGAN:  Of course.  Of course, your Honor.  I am

18   prepared and could give some explanation as to why that

19   occurred and would be happy to do so, but I'm not going to

20   volunteer that.

21       THE COURT:  Right.  Just on a motion to dismiss.

22       MR. COOGAN:  Okay.  According to the complaint, the

23   documents relate to various Onyx projects.  Onyx is essentially

24   an investment company devoted -- investment and finance company

25   devoted to the construction and financing of solar energy

N1CConyO.

|   |   |
|---|---|
| 1 | projects for municipalities, schools, hospitals, smallish |
| 2 | public entities like that. |
| 3 | What Onyx alleges is that these documents related |
| 4 | broadly to those projects.  It is very evident from both the |
| 5 | complaint and the documents that we believe the Court can take |
| 6 | judicial notice of that were submitted with my declaration, |
| 7 | that Onyx was aware of that download immediately after it |
| 8 | occurred.  In one of the emails, I believe it's referenced that |
| 9 | Mr. Wang, who is sitting at counsel table there, actually |
| 10 | emailed to Mr. Kao a list, a full list of those 10,500 |
| 11 | documents in, I believe it's June of 2021, possibly early July. |
| 12 | So they have been aware of exactly which documents |
| 13 | were downloaded for well over a year at this point.  They have |
| 14 | possession of those documents because they sat on this box data |
| 15 | room, which was an online repository for these documents.  So |
| 16 | Mr. Kao sort of did not abscond with copies of documents. |
| 17 | Everybody knew what had been downloaded.  Mr. Kao was general |
| 18 | counsel at the company, as alleged in the complaint.  He had an |
| 19 | extremely broad portfolio of responsibilities.  He was given |
| 20 | unfettered access — is the word that plaintiff uses in the |
| 21 | complaint — to this data room. |
| 22 | As I said, there is a very legitimate reason why this |
| 23 | occurred.  I will not go into that.  But I think it is very |
| 24 | clear from the complaint that there is no allegation that at |
| 25 | the time he downloaded these documents he had an intent to |

N1CConyO.

1    resign.

2           So, putting those two facts together, the breadth of

3    his responsibilities, which resulted in unfettered access to

4    this box data room, and the fact there was no intent to resign

5    at the time he downloaded them, he was fully within his

6    authority as general counsel of the company to get these

7    documents onto his company laptop.

8           THE COURT:  Isn't his intent something that should be

9    decided at a later stage in this case and not on a motion to

10   dismiss?

11          MR. COOGAN:  Your Honor, they don't allege it.  And

12   the thread that I think they try to connect is that he

13   downloaded these things that his wife then, roughly a year

14   later, started her own venture that they allege was a competing

15   venture with Onyx, and somehow those documents are now being

16   used in connection with her business.

17          Intent is very important to allege here because the

18   allegations of the breadth of his responsibilities naturally

19   lead to the conclusion that had he no intent to resign at the

20   time these documents were downloaded, he was fully within his

21   authority to be on this data room and transferring documents,

22   work-related documents to his company laptop.  That's the

23   allegation.

24          The complaint pleads essentially general categories of

25   documents, financial models is one term used, solar system

N1CConyO.

1    records, customer and investor agreements, tax credit

2    applications and the like.  In the entirety of the complaint,

3    there is one document specified, that's a spreadsheet that the

4    plaintiff characterizes as a financial model showing data

5    related to certain completed projects in Onyx's portfolio.

6    That document, and I think it's very important to read the

7    complaint very closely, is that alleged to be a trade secret or

8    to contain a trade secret.

9         There are two paragraphs in the complaint where the

10    plaintiff gives a description of what its trade secrets are.

11    Paragraph 14, which is a very general paragraph in the

12    background section of the complaint that purports to describe

13    the plaintiff's business.  The description in that paragraph is

14    never connected to this download of documents.

15         So, the only paragraph that purports to characterize

16    broadly as trade secrets, the documents that were downloaded is

17    paragraph 120.  That paragraph alleges that certain of the

18    documents were trade secrets, certain of the 10,500 documents

19    were trade secrets, including financial models and some other

20    categories.

21         THE COURT:  I'm sorry.  Let's just sort of slow down a

22    little bit if we can.  Paragraph 14, which you just cited, is

23    in the context of describing Onyx's business, and it says that

24    in establishing a comprehensive suite of services to build and

25    finance solar energy systems for customers, Onyx has developed

N1CConyO.

1    a tremendous amount of resources to develop trade secrets and

2    other confidential and proprietary information.  These trade

3    secrets include, but are not limited to, the financial models

4    by which Onyx determines the commercial viability of solar

5    projects; the financial models and documentation under which

6    Onyx finances portfolios of solar energy systems and structures

7    the purchase and sale of portfolios of solar energy systems;

8    the engineering knowledge needed to draft plans for solar

9    energy systems; Onyx's network of subcontractors and suppliers,

10   the operational knowledge needed to maximize the output of

11   these solar energy systems; and Onyx's list of both current and

12   potential customers.

13           And then in paragraph 15, they talk about how this set

14   of trade secrets had been developed over time and at

15   significant expense.

16           Then, paragraph 46, it says that Mr. Kao

17   misappropriated documents that reflected years of work by Onyx,

18   thousands of personal hours by Onyx employees and hundreds and

19   thousands of documents and fees paid to outside vendors.

20           I'm sure plaintiff's counsel will do a better job of

21   responding to what you say so far than I can, but in paragraph

22   47, there's a line about how prior to downloading these files

23   on May 15th of 2021, Mr. Kao had downloaded only 11 files from

24   the Onyx data room in all of 2021, which I assume counsel will

25   argue goes to his intent as to why all of a sudden he's

N1CConyO.

1    downloading so many documents all at once.

2              Then, in paragraph 52, it alleges that the documents

3    downloaded from the Onyx data room contain Onyx's confidential

4    and proprietary information, including trade secrets and

5    qualify as confidential information under the terms of the

6    employment agreement.

7              And then in 53, 54, 55, 56, and 57 I think are all

8    relevant allegations.  The data room, this is paragraph 53,

9    documents related to numerous projects that had been developed

10   and financed by Onyx throughout the United States, including

11   financial confidential financial models, et cetera, et cetera.

12   Paragraph 54 talks about how they relate to highly confidential

13   ways in which Onyx secures strategic capital, then it uses the

14   example in paragraph 55 of the one spreadsheet.  It says, among

15   other things, in paragraph 56, that this information on the

16   projected performance of each Onyx solar energy system is at a

17   competitive advantage for Onyx, et cetera.

18             MR. COOGAN:  I'm sorry, your Honor.  What paragraph

19   was that?

20             THE COURT:  56, that Onyx has developed years and

21   countless hours of efforts to both identify and develop the

22   solar energy systems in the portfolio and modeled the

23   performance of those solar energy systems.  In order to model

24   the financial performance of a given solar energy system, the

25   spreadsheet uses a proprietary set of formulas which reflect

N1CConyO.

Onyx's years of experience in the solar energy business, among other things in paragraph 57, that the model also projects the value of the portfolio of solar energy systems to tax equity investors.

So we can talk and I'll of course hear your argument as to why, in your view, this doesn't sufficiently allege trade secrets with the requisite specificity. Paragraph 52 responds to what I think you just said, it alleges that the documents downloaded from the Onyx data room contain this confidential and proprietary information, including trade secrets. Didn't you just argue a few minutes ago that there are no allegations that the documents that they define as trade secrets were part of the download or did I not hear you correctly? I can get the transcript up. Maybe that's misunderstood.

MR. COOGAN: No, I don't think you did. That's correct as far as it went, but I think it needs a slight bit more explanation.

It's incredibly important, I think, to read this complaint very closely. Essentially, we sort of characterize it this way in the reply papers. What's going on here is there is -- there are 10,500 documents, they don't allege that all those documents contain trade secrets, and they couldn't, in good faith, allege that. It's just, we know what the documents are. It is not the case.

THE COURT: At the very least, in paragraph 58, and

N1CConyO.

1    this is the last one I'll read for now, but in addition to

2    misappropriating the financial model contained in the Onyx

3    portfolio model, 04.13.20 spreadsheet — I'm skipping some of

4    the code language — Mr. Kao misappropriated financial models

5    for two other portfolios of Onyx solar energy systems and

6    Onyx's debt finance model, which itself includes models for

7    four different financing structures.

8            So, as to the allegations, again, we can talk

9    separately about how they specifically allege enough that these

10   are trade secrets, but as to your point that he didn't actually

11   download the material plaintiff alleges contained trade

12   secrets, flesh that out for me.  I'm not sure I understand that

13   argument.

14           MR. COOGAN:  Thank you, your Honor.  I sort of glossed

15   over this a little bit.  There is a big distinction here

16   between downloading to the company laptop, which he returned,

17   and then downloading to this nebulous personal device that they

18   point to in the complaint.  There is no allegation that all of

19   these documents were downloaded to that personal device, there

20   is no allegation in the complaint that that occurred.  They

21   don't even make the inference that because the device was

22   allegedly connected to the computer at the time that they were

23   somehow downloaded directly to the device or otherwise

24   transferred to them.  What they do is they say that the

25   documents were downloaded to the company computer and then

N1CConyO.

1    there are various interactions and connections that both

2    Mr. Kao had and his external hard drive had with that laptop.

3    That's what I mean when I say that there's no specific

4    allegation that this spreadsheet was downloaded into Mr. Kao's

5    personal possession.

6         It's very different under the case law interpreting

7    the DTSA, the Defend Trade Secrets Act, between putting

8    something on a company device and downloading it to some

9    personal repository that there is some rule of prohibition on,

10   either explicitly or implicitly.  So they never connect that

11   thread between what is a trade secret and what was downloaded

12   to Mr. Kao's personal possession.  It's very important to

13   remember that he's just, he's doing this with a company laptop

14   that he then ships back to the company after he resigns.

15        THE COURT:  What about paragraph 90, which is after

16   the resignation on June 6th, 2021, H. Kao connected his Seagate

17   external storage device to a second Onyx laptop that he used

18   while working for Onyx.  He then interacted with the folder --

19   I'm not going to read all the language about which folder it

20   was, but that folder on his Onyx laptop and subsequently

21   interacted with a different folder.

22        You're saying that that information about which folder

23   this was doesn't give you enough information about whether they

24   were the documents that plaintiffs allege were trade secrets?

25        MR. COOGAN:  Absolutely not.  I think it's also

N1CConyO.

1    important to remember that this was a person who resigned,

2    obviously, May 17th.  There were discussions, as plaintiff

3    alleges, about getting company property back.  As any of us who

4    have worked for an organization for more than five minutes

5    know, presently, one needs to get personal documents off of

6    things, organize things, do stuff like that, especially at a

7    small company like this where everybody used personal devices

8    where that kind of organization and preparation back to the

9    company is important.

10        I think it's important to understand here, and I

11    believe they allege this, Mr. Wang was Mr. Kao's subordinate at

12    the time, and he did not have access to the breadth of

13    information and documents within the company that Mr. Kao had,

14    including Mr. Kao's emails.  So if you look at the emails with

15    Mr. Wang, what is going on there is very evident that there is

16    this kind of organization and preparation of materials to send

17    back to the company.

18        I would also note, your Honor, that there is no

19    allegation that any document was put into this folder.  And

20    typically, an H drive on a Windows-based machine, which this

21    is, just based on the file path, is the local drive where

22    people typically keep personal things, whatever they are,

23    whether they're received through email, they're given by the

24    company, whatever.  So it is just totally unremarkable.  I

25    would expect a high percentage of people leaving companies

N1CConyO.

1    would have this kind of forensic breadcrumbs lurking into their

2    personal folders on their devices.  I know I would.  So they do

3    a lot of alleging about specific connections between the hard

4    drive and the laptop.

5              What they don't do, again, is trace any thread that

6    you can connect from the download to something that ultimately

7    wound up in his personal possession or that he attempted to put

8    into his personal possession because just based -- on the face

9    of the allegation of paragraph 9, I would suggest, your Honor,

10   the H drive is sort of broadly known to be the Windows drive

11   where an individual keeps individual documents as opposed to a

12   network folder, an online repository of company documents, et

13   cetera, and they don't allege anything else about that folder.

14             I just want to make one other comment, rewind me to

15   paragraph 52, if I may, because I think it very well

16   illustrates what's going on here.  The documents downloaded,

17   i.e. to the laptop, contain confidential and proprietary

18   information, including trade secrets.  So just by the syntax of

19   that sentence, they are acknowledging that not all of these

20   documents are trade secrets.  And I realize this is a very

21   close reading of the complaint, but they never draw the line

22   between this document or -- I think there is actually only one

23   document really specified in this collection of paragraphs from

24   53 to roughly 58, and it's mostly focused on this April 13th,

25   2020 Excel spreadsheet.  There is a sentence, as your Honor

N1CConyO.

1    noted, about misappropriation of financial models.  What is

2    missing entirely from that collection of paragraphs is any

3    allegation that those documents either are or contain trade

4    secrets.

5         And that is very important here, especially when you

6    look at even the title of this document.  It's a document that

7    was created -- it purports to be a model that was created a

8    year before it was downloaded.  And paragraphs 55 and to 56

9    show that what this document is, is an analysis of a completed

10   project that is running, it's a solar energy system that is

11   running.  They have completed the project and it is an analysis

12   of projected operating expenses, revenue, what the results have

13   been of the performance so far.

14        Those are the types of analyses that your Honor

15   previously, in the Sapir case, I believe rightly held are not

16   the highly valuable and confidential and complex, not broadly

17   known information that can constitute trade secrets.  There is

18   a very large difference between a trade secret and proprietary

19   and confidential information.  The phrasing throughout the

20   complaint is that Mr. Kao was doing such and such with Onyx's

21   proprietary information or these documents include proprietary

22   information, including trade secrets.  We believe it's very

23   deliberate, it's very careful because, at the end of the day,

24   they cannot allege that all of these documents are trade

25   secrets.

N1CConyO.

1          THE COURT:  Do they all have to be trade secrets?

2   Some of them can be?

3          MR. COOGAN:  Yes, your Honor, some of them can be.

4   But the point on the pleading standard, and this, again, is I

5   think well explained in your Honor's Sapir v. Rosen case, as

6   well as some of the other cases we cite in our papers, there is

7   a well settled standard for pleading misappropriation of trade

8   secrets in federal court, and one must specify what the trade

9   secrets are.  When you have a fact set like this where there is

10  just a huge, undifferentiated mass of documents, that they are

11  extremely well situated to say exactly what they contend is a

12  trade secret in those documents.  They've chosen not to do

13  that.

14          Ultimately, what's going to result here is that, in

15  terms of discovery, scope of the case, cost, litigation

16  activity in front of a court is much different in that kind of

17  situation than in the situation where they are saying okay,

18  these four documents are trade secrets.  Okay, we can argue

19  about that, he is given potentially notice of what the claim

20  is, it's much different in this situation where we have 10,500

21  documents.  They acknowledge that they're not all trade secrets

22  and they have an ability to allege which is a trade secret and

23  what they contend is a trade secret, and they've just chosen

24  not to do so.  It falls well below the Rule 9 pleading standard

25  in this kind of claim.

N1CConyO.

1          THE COURT:  But are you saying he hasn't even alleged

2    that he downloaded one document that plaintiff is alleging had

3    trade secrets?  Look at paragraph 110, for example, and it's in

4    the context of saying that Mr. Kao never certified that he

5    destroyed the Onyx materials; right?

6          MR. COOGAN:  Yes.

7          THE COURT:  It then alleges he appears to believe he

8    is unrestrained in the retention, use, or disclosure of Onyx's

9    confidential trade secret information for his own personal

10   gain.  It's clearly alleging that he has downloaded something

11   that they're alleging contained trade secret.

12         Your point is they haven't alleged which of the

13   10,000-plus documents contain trade secrets and then they

14   haven't alleged with specificity that they're trade secrets.

15         MR. COOGAN:  There's another point, your Honor, and it

16   goes to one of the prongs of defined as what constitutes

17   misappropriation of a trade secret.  There has to be

18   acquisition of a trade secret through improper means.  Again,

19   very important.  I think the word "downloading" in this case is

20   ambiguous, and I would say that read in context, it's very

21   clear that what they're talking about here is the original

22   download to the laptop.  When you try to parse from the

23   complaint what they allege was transferred from the laptop, if

24   anywhere, to a personal device, it gets -- it is very unclear.

25   And that's why maybe, a little colloquial, we call it a shell

N1CConyO.

1    game in the reply papers because it really is -- they show you

2    this 10,500 mass of documents, they show you this spreadsheet.

3            The one problem that your Honor just pointed to is

4    they don't specify that spreadsheet as a trade secret, but I

5    think just as importantly, they never allege that that

6    spreadsheet was actually downloaded and put into his personal

7    possession.  Again, the laptop was shipped back to the company.

8    So there's just no basis to conclude that any particular

9    document here is or was in his personal possession.

10            THE COURT:  Okay.

11            MR. COOGAN:  Your Honor, I don't want to beat a dead

12    horse, but if all of those paragraphs, and I won't go back

13    through it in detail, but we have spent hours and hours doing

14    this, and the only two paragraphs that purport to try to

15    explain what trade secrets are, are 14 and 120.  So if you read

16    that, as I said, the collection of paragraphs, I think it's 53

17    to roughly 57, they do talk about misappropriation, they never

18    call that document a trade secret.

19            Now, if they are --

20            THE COURT:  That's not a fair inference, in your view?

21            MR. COOGAN:  I don't think so because there is this

22    breach of fiduciary duty claim and there is a contract claim,

23    both of which allege that he took, misappropriated not only the

24    information that would satisfy the heightened threshold of a

25    trade secret, but just plain vanilla confidential information,

N1CConyO.

1    and there is a difference between those two.  The latter I

2    think includes the former, but certainly the former does not

3    imply the latter.

4              THE COURT:  Thank you.  I think what I'm going to do

5    is have plaintiff's counsel respond on the trade secrets claim,

6    if you have any brief rebuttal, and then we'll turn to the

7    breach of fiduciary claim separately.

8              MR. COOGAN:  Okay.  Thank you, your Honor.

9              I won't belabor this either, but I do think the timing

10   and the way that the plaintiff has gone about this case, it

11   sort of betrays what is going on here.  There really is nothing

12   about this case that suggests that there is some belief that

13   there are trade secrets that are in his possession that are

14   being used against Onyx somehow.  And you look, it's just paper

15   thin when you get to the use prong of the DTSA test, they do

16   not allege in any factual way that he has done anything with

17   these trade secrets.

18             So I think I've gone through -- sorry.  I'm just

19   trying to reposition myself in the argument.  I've gone through

20   the first prong of the defend trade secret analysis, which is

21   the specification or the pleading of the existence of the trade

22   secret, and we've gone through that in some depth.

23             There is the other element of a federal

24   misappropriation of trade secret claim is the actual

25   misappropriation, and there are essentially three ways that one

N1CConyO.

1    can plead that.  These, I'm just going to give your Honor the

2    cite so it's on the record, it is cited in our papers.  These

3    are under 18 U.S.C. 1839, it's the definitions provision of the

4    statute.  The relevant definition of the word

5    "misappropriation" is explained in subparagraph 5, it's 5(A)

6    and 5(B).

7            So, under 5(A), in order to plead misappropriation

8    under the DTSA, it is required to plead that somebody acquired

9    a trade secret of another by improper means.  So that goes to

10   the point that they have not actually connected the dots in

11   this complaint, that any document that has been pleaded as a

12   trade secret actually wound up in his personal possession as

13   opposed to downloading to the company's laptop at a time when

14   he was general counsel, and there's no allegation that he

15   intended to resign two days later.

16           THE COURT:  And you don't think the fact that he

17   downloaded over ten thousand documents a few days before he

18   resigned, after only having 11 before in his whole time as

19   general counsel, is sufficient for me to make the inference

20   that I need to make here?

21           MR. COOGAN:  I don't, your Honor, because they haven't

22   alleged it and I don't believe they can allege there was some

23   intent.  I agree with your Honor, they can't be expected to be

24   inside his head, but they at least have to allege that element.

25   There is no allegation in the complaint that this was done at a

N1CConyO.

1    time when he intended to leave the company. Frankly, they

2    cannot allege that because the facts just aren't there.

3         Just to cover the other prong of the misappropriation

4    definition is use of a trade secret that was acquired through

5    improper means, as well. There is a third way to plead

6    misappropriation, and that is disclosure that's not at issue

7    here because they haven't pleaded it. They haven't pleaded use

8    here either. They try to draw the inference that because

9    Mr. Kao's wife is running an allegedly competing company that

10   started almost a year later, that, somehow, he's now using

11   those documents, which is not sufficient under the pleading

12   rules.

13        THE COURT: Why don't we hear from plaintiff's

14   counsel.

15        MR. JACOBS: Thank you, your Honor. Good morning

16   again, your Honor. My name is Benjamin Jacobs. I'm from

17   Morgan Lewis & Bockius.

18        I want to start by resetting the Court on what this

19   case is about. The first ten pages of Mr. Kao's motion and the

20   first piece of Mr. Coogan's arrangement is what an upstanding

21   member of the bar Mr. Kao is, his years of practice. Of

22   course, none of that is relevant to the instant motion, but

23   because it's been raised, I feel compelled to just discuss what

24   the actual allegations are here and allegations that Mr. Kao

25   does not deny, he doesn't deny any of this.

N1CConyO.

1          He was the general counsel of Onyx.  He was the

2     company's most trusted legal advisor.  On Saturday evening, not

3     Saturday morning, Saturday evening, May 15th, he downloads

4     10,000 documents.  He doesn't deny that.  Mr. Coogan just

5     acknowledged he did.  He had downloaded, as your Honor pointed

6     out, only 11 documents in all of 2021 before that time, doesn't

7     deny that.  On Monday, May 17th, he transferred those documents

8     to a personal storage device — that is a fact issue — and he

9     resigned from the company Monday morning, not Monday night.

10          And I think, your Honor, the best example of what a

11     stretch this motion is, is on page 19 of Mr. Kao's opening

12     brief, which is docket 26.  Your Honor was hinting at this, I

13     think.  He's telling the Court in a filed pleading that he

14     didn't know on Saturday evening, when he downloaded 10,000

15     documents, that he was going to resign on Monday morning.

16     Here's the quote from his brief.  At the time of the alleged

17     download on Saturday, May 15th, 2021, Mr. Kao had no plan to

18     resign from the company.  Your Honor, one, I think that's

19     highly incredible.  At best, for him, it's a fact issue.

20          That leads me to another question your Honor asked,

21     and I want to answer a few of those questions.  Your Honor

22     asked Mr. Coogan isn't Mr. Kao's intent something that should

23     be decided later by this Court.  The answer is absolutely yes

24     and the law says the answer is yes.

25          Let's first look at the allegations as to his intent.

N1CConyO.

1    Mr. Coogan says there are no allegations as to Mr. Kao's

2    intent.  Your Honor, let's look at paragraphs 47 through 49.

3    We note that prior to May 15th, 2021, he had downloaded only 11

4    files from Onyx.  We say measured against his prior conduct on

5    48, the volume of documents downloaded was highly anomalous —

6    and let's remember that phrase because it's important in the

7    law.  And we also say this is important, there was no

8    work-related reason for Mr. Kao to download this document,

9    there wasn't much discussion of the law, the actual cases in

10   the briefing in Mr. Coogan's argument.

11         But let's look at one of those cases, the Bombardier

12   case, it's Bombardier v. Mitsubishi, 383 F. Supp. 3d 1169,

13   which is cited in our brief on page 16.  This exact issue --

14   your Honor's question was answered.  The Court says on

15   page 1185, the plaintiff plausibly alleges that the defendant

16   acted or Mr. Basson acted with the requisite knowledge that

17   documents that Mr. Basson sent to himself were marked private

18   and confidential, we allege that the documents were password

19   were protected, and access was restricted to the folks that

20   needed it.  But, most importantly, Mr. Basson emailed these

21   documents to himself on his last day at Bombardier, at which

22   point he could not reasonably be taking the documents home in

23   order to perform work for Bombardier.  That is exactly what we

24   allege, and based on those allegations, quote, the Court

25   concludes that Bombardier plausibly alleges that Mr. Basson

N1CConyO.

knowingly and improperly acquired, used, and disclosed the
trade secrets.

I'd also point your Honor to Lodging Solutions, pages
13 to 16 of our brief, where the Court said that downloading or
emailing -- I don't remember there if it was a download or an
email, but that sort of activity in the days leading up to the
end of your employment are unusual circumstances, that's the
quote, similar to highly anomalous from which a Court can infer
intent.  Remember, as your Honor pointed out, Onyx's factual
allegations must be accepted as true.  So, at best, at best,
Mr. Kao could try to argue to a fact finder that he had no ill
intent when he downloaded documents on Saturday, but that is
for a fact finder, and I would submit to you that there is no
way that a fact finder would believe that argument.

Next, I want to address Mr. Coogan's argument about
whether we've sufficiently alleged the trade secret, your
Honor.  Mr. Coogan said the only -- we've only described or
alleged that trade secrets -- the documents contain trade
secrets, excuse me, at paragraphs 14 and 120.  That's simply
incorrect, and I think your Honor was getting at this.

The key paragraphs here for your Honor to look at are
52 to 59.  We say, first of all, expressly, that the documents
downloaded contain trade secrets in 52.  We say exactly what
types of documents were downloaded, the capitalized term "Data
Room Documents" is defined, your Honor, as the documents he

N1CConyO.

1    downloaded from Onyx.  And we say they relate to numerous

2    projects that have been developed and financed throughout the

3    United States.  I also want to note that these are not dead

4    projects, your Honor, these are ongoing projects that are

5    ongoing through 2023 all the way through 2035.

6        We, unlike in many of these trade secrets, we identify

7    a specific file that is most sensitive and that, frankly, I

8    don't know how one could argue we haven't sufficiently alleged

9    a trade secret.  Mr. Coogan also mentioned a name.  I want to

10    point out in paragraph 55, the name of that file was

11    anonymized.  We say that in footnote 1.  We obviously didn't

12    want to put the actual name in the record.

13        So that Onyx portfolio model is an anonymized name,

14    but we say exactly what it includes, a description of each

15    solar energy system throughout multiple states developed by

16    Onyx within a particular investment portfolio.  We say exactly

17    what data points get inputted into the Excel, operating

18    expenses for each and every one of those projects, projected

19    revenue, not past revenue, projected revenue for each system,

20    depreciation and projected profit, all of which is then put

21    into the spreadsheet and the spreadsheet uses a proprietary

22    formula — we allege that expressly — that Onyx developed itself

23    and based on years of experience.  That's in paragraph 56.  And

24    we even say how the trade secret is used in 57, as your Honor

25    pointed out.  It projects the value of the solar energy systems

N1CConyO.

1  to tax equity investors.  And we also say, I think there was an

2  allegation that we've only referenced one document.  Mr. Coogan

3  is right that the trade secret standard is not that you need

4  to -- or that you need to put the defendant on notice on what

5  he's alleged to take, but importantly, as your Honor pointed

6  out in Powell, you don't need to name each and every document

7  that's a trade secret.  And what we say in 58 is this isn't the

8  only financial model he's taken, we say he's taken two other

9  similar portfolios of Onyx's solar energy system and a debt

10 finance model, which itself includes models for financing for

11 different structures.

12         THE COURT:  Isn't it enough when you're alleging that

13 the download involved the 10,507 documents to only allege that

14 a few were trade secrets?  Could this not be alleged with more

15 specificity as to which particular documents were trade secrets

16 and why those particular documents constitute trade secrets?

17         MR. JACOBS:  Your Honor, I think, frankly, the

18 challenge is threading a needle between giving the Court and

19 the defendant notice of what's, I'll call it most sensitive

20 trade secrets.  He downloaded 10,000 documents.  I suppose we

21 could have gone through document by document in a thousand or

22 two-thousand paragraph complaint and identified each one, but

23 what we were trying to do is give a specific example of the

24 most egregious one, give examples of others, which we do in

25 paragraph 14.  And your Honor asked, do they all have to be

N1CConyO.

1    trade secrets.  The answer, of course, is no.  And Mr. Coogan,

2    of course, is right, we're not alleging they're all trade

3    secrets, but what we are alleging is certain and specific

4    pieces, certain and specific documents he took are trade

5    secrets, they don't all have to be trade secrets.  If he took

6    one trade secret, he's violated and misappropriated it, which

7    we'll talk about, he's violated the DTSA.

8         I think, essentially, Mr. Coogan uses this term,

9    "undifferentiated mass of documents," and he compares that to

10   the document at issue in the Powell case, which your Honor

11   decided where there was only one document at issue.  And he

12   says, well, Powell was more specific because there was only one

13   document at issue, one model at issue.  That's because the

14   defendant in Powell BNY was only alleged to have

15   misappropriated one document.  Here, Mr. Kao took 10,000

16   documents.  He's basically saying because you guys identified

17   one specifically, essentially by name, almost by name, others

18   by description, it's too broad, it's too undifferentiated when

19   there should be no dispute that we've provided the level of

20   specificity necessary at least for that one document, again

21   going back to 53 to 58.

22        And I would point your Honor to the chart on page 9 of

23   our brief that shows -- I would argue we provided more

24   specificity than in Powell where your Honor held the trade

25   secret was sufficiently alleged.  There, there was a separate

N1CConyO.

1    issue where your Honor dismissed because the documents -- the

2    plaintiff had allowed the documents to be freely disclosed to

3    third parties.

4            I want to move on use prong, your Honor, unless you

5    have any further questions or concerns about the first prong.

6            THE COURT:  That's fine.  I also just wanted to talk

7    about use, as well.  Why don't you go ahead.

8            MR. JACOBS:  That's perfect.  I want to make something

9    really clear on the use prong.  As Mr. Kao correctly notes in

10   his brief, and your Honor laid out in Powell, for the use

11   prong, it's not that you have to show an improper acquisition

12   and disclosure use, it's an "or."  You have to show improper

13   acquisition or disclosure use.  Here, I would argue we've done

14   both, but I want to focus on improper acquisition.

15           One of the things Mr. Coogan argues is that we allege

16   that there's been activity on the laptop consistent with him

17   putting it on the devices, but we don't allege exactly what's

18   on the devices.  Your Honor, that's because we've asked for the

19   devices back and we haven't gotten them.  One of them

20   apparently is missing, one of them, Mr. Coogan fortunately has

21   in his possession.  And this scenario, first of all, comes up

22   all the time in trade secrets cases.  A forensics person cannot

23   say with certainty what is on a device without having access to

24   the device.  The most that the forensics person can do is what

25   we have done here, which is say the device was plugged in at

N1CConyO.

1    the same time that folders were being interacted with, which is

2    exactly what we do, and I believe it's page 64 -- I'm sorry.

3    Paragraph 64 of our complaint.  We say while the device was

4    plugged in -- 63 and 64 taken together.  While that device was

5    plugged in between 8:56 and 9:10 p.m. on May -- I'm sorry.

6    A.m., on May 17th, the morning he resigned, Mr. Kao, quote,

7    extracted files from compressed zip folders Onyx Renewable

8    Partners data room, transaction A, transaction B.  We're giving

9    the Court and Mr. Kao the exact times that he interacted with

10   these files while the device was plugged in and what files he

11   interacted with.

12            On this point, I would point your Honor to the

13   Mickey's Linen v. Fischer cited in our brief.  There, the Court

14   found under both the Illinois Trade Secret statute and the

15   DTSA, that Illinois courts — and I recognize it's Illinois

16   courts, but it's still interpreting the same type of statute,

17   and this one was a DTSA case — have repeatedly held that a

18   plaintiff can rely on circumstantial evidence to prove

19   misappropriation by drawing inferences perhaps from ambiguous

20   circumstantial evidence since, quote, direct evidence of theft

21   and use of trade secrets is often not available.  Again, once

22   we get into discovery and we get access to at least the one

23   device, we'll have to deal with the fact that one device is

24   missing, it's troubling, but once we get into discovery, that's

25   when we can see what's on the devices, but we can't allege more

N1CConyO.

1    at this point than telling the Court and telling Mr. Kao when

2    he interacted with the folders and what folders he interacted

3    with.  And courts --

4            Let me pause there and ask if your Honor has any

5    questions.

6            THE COURT:  No, thank you.

7            MR. JACOBS:  I want to talk about, your Honor, because

8    it relates the misappropriation case, the use page, which,

9    again, improper acquisition is sufficient to allege use.

10   Mr. Kao says that there's no evidence of use -- there's no

11   allegations of use, I should say.

12           First of all, there are several allegations that he's

13   accessed some of these documents --

14           THE COURT:  Is accessing or interacting — I think was

15   the word you used in the complaint, as well — sufficient to

16   establish use?

17           MR. JACOBS:  It is, your Honor.  If you look at that

18   Mickey's case, it's exactly what the plaintiff pled, that there

19   was evidence consistent with the activity.

20           Also, Your Honor, I would point your Honor to the

21   Expert Connect case, that's an SDNY case.  Similar idea.  The

22   court says plaintiff have hired an expert to conduct a forensic

23   examination and analysis of Expert Connect laptops.  The

24   resulting report described evidence consistent, not proving,

25   consistent with Fallers having saved many of plaintiff's

N1CConyO.

1    documents on her laptop and then copying them to a USB hard

2    drive.  That's the most you can do, your Honor.

3         I would also say, your Honor, with respect to this

4    idea that -- it goes to a couple points Mr. Coogan made.  The

5    letters that Onyx wrote to Mr. Kao to get the documents back or

6    to get assurances that they destroyed, and we're getting a

7    little bit into the breach of contract claim here, but it

8    overlaps.  He says, well, the contract says that I can use the

9    documents for work purposes, and the contract says I can use

10   the document for work purposes and Onyx asked me to destroy and

11   delete the documents, so I didn't breach anything by not

12   returning the documents to them.

13        The letters that are at issue which, one, I would

14   argue are outside the complaint, but since they're in the

15   record now, there is a glaring omission from Mr. Kao's papers.

16   They asked him to sign a certification certifying that he had

17   destroyed them and not used them, sent two letters to that

18   effect, never got it.

19        And since we're here, let's talk about the delay.

20   Again, totally outside of the complaint, totally beyond the

21   scope of this motion, but if you want to talk about this

22   alleged delay between when Mr. Kao resigned and when we filed

23   this complaint, let's talk about the timeline.

24        Remember, first of all, that Onyx was left, because

25   they trusted Mr. Kao, without a general counsel to advise them

N1CConyO.

1   in this space, without a CEO, and they did try to get the

2   documents back.  They wrote twice.  They thought -- because

3   they thought he was an upstanding member of the bar, as he

4   says, that of course he would return his client's documents, of

5   course he would certify that he hasn't used them.  They never

6   got that assurance, but in the meantime, there is this

7   litigation.

8          And by the way, the only thing relevant to the state

9   court litigation -- first, I would say none of it is relevant,

10  but if you want to talk about the state court litigation, the

11  state court denied a motion to dismiss a breach of fiduciary

12  duty claim against his wife for, in part, helping him engage in

13  the exact type of activity that's at issue here.

14         But, your Honor, there's a reason why Onyx filed a

15  complaint when it did, and that is it's in the complaint.  On

16  April 26th at paragraph 11, on April 26th, Mr. Kao's wife

17  announced she would be competing and is now competing.  So Onyx

18  of course was trying to use restrain, of course litigation is a

19  last resort, Onyx of course thinks its former general counsel

20  is going to return its documents, but it gets to a point where

21  your wife announces a competing company and you have in your

22  possession all the tools that you would need to start that

23  competing company.  That's the key to the trade secret case.

24  Mr. Kao is a lawyer, he's not a finance guy, but now he can

25  give to his wife the exact tools that one would need to compete

N1CConyO.

1    with Onyx, to undercut Onyx with investors and customers.

2              THE COURT:  Just because we've been going so long, I'm

3    going to ask you to wrap it up shortly.

4              MR. JACOBS:  Of course.

5              THE COURT:  Thank you.

6              MR. JACOBS:  Your Honor, I don't think you need to get

7    to the issue of whether there is allegations of use because

8    there would be -- allegations of improper acquisition are so

9    clear.  But if you do get there, I want to remind the Court

10   again of the cases we cited, including the Mickey's case that

11   says the Court can rely on circumstantial evidence.  It is very

12   rare before discovery that you know exactly what's gone on

13   between the taking party, let's call it.  It's almost

14   impossible, especially when the taking party hasn't returned

15   the device.  But courts have said when you have unusual

16   circumstances, when you have anomalous circumstances, where you

17   have suspicious circumstances, and I think, at minimum, based

18   on your Honor's question about the volume of documents taken

19   and the timeline of taking them, you have that, you can infer

20   use, especially when there is a compete -- you don't even need

21   to have a can competing company, but when you have a competing

22   company, as in a couple of the cases we cited, and I'll point

23   your Honor to them and then finish up, it's even more reason to

24   suspect use.

25             Let me point your Honor to one case in particular.

N1CConyO.

1   Lodging Solutions, your Honor, and I believe the AUA case both
2   involve situations where the taking party was going to a
3   competitor -- I'm sorry.  Expert Connect.  Expert Connect,
4   which is 2019 WL 3004161, found that circumstantial evidence
5   such as starting a competing company is sufficient for the
6   Court to infer that the allegations satisfy the
7   misappropriation prong.

8           Thank you, your Honor.

9           THE COURT:  Mr. Coogan, if you want to respond, you
10  can do so just in a minute, just because, again, we have gone
11  over.

12          MR. COOGAN:  Thank you, your Honor.  I don't want to
13  get into the cases we cited, we deal with them in the briefs,
14  but they are vastly different.  They're emailing themselves.
15  The Expert Connect case, the person was in direct competition.
16  There is no allegation that Mr. Kao is involved with his wife
17  with the business.

18          I have to respond to a couple of things because
19  Mr. Jacobs opened the door.  I didn't intend to get into this.
20  He characterized that Seagate drive, which is the primary drive
21  that they allege that he had connected to this computer, it was
22  not missing, it was destroyed.  It was destroyed because they
23  told him to destroy it, and I have told that to Mr. Jacobs and
24  his colleagues.  It is inaccurate to call that missing.

25          The certification that they asked him to sign,

N1CConyO.

extremely broad, certifying under penalty of perjury that he
has no Onyx documents in his possession.  He was outside
counsel for the company for over two years before he was
employed.  There is an engagement letter where there is a
waiver of conflict between his wife and him.  No lawyer is
going to sign a certification like that in those circumstances,
and they don't have any right to demand it from him.  The
bottom line is the device has been destroyed exactly as they
requested.  And the relationship obviously was known from the
beginning, as I said, there was a waiver.

       I do want to just focus for one second on this issue
of what we believe is a vast difference from allowing this case
to go forward as it is or as it's pleaded right now versus make
them allege what documents are they saying are trade secrets.
Mr. Jacobs said we could have gone through document by
document, and that is quite obvious because they have had that
information for over a year, they have the documents, they are
extremely well positioned to do exactly that.  The case law
that allows plaintiffs to get by on less specific allegations
involve facts where the plaintiff is not in a position to do
that because they don't know what the person took or there is
some other lack of visibility into what documents are at issue.
I would suggest, your Honor, that they have 100 percent ability
to tell us which documents they contend are trade secrets and
that will make this case, if your Honor allows it to go

N1CConyO.

1    forward, vastly different, it will be vastly reduced discovery,

2    it will be vastly reduced litigation, depositions, everything

3    about the case --

4         THE COURT:  That's something that can be dealt with at

5    the stage of discovery, that they specifically identify the

6    specific documents?  In any event, I hear your argument.  Why

7    don't we move on.

8         MR. COOGAN:  The last thing I would just say is we

9    think this is on all fours with Sapir, which your Honor decided

10   and we think should come out --

11        THE COURT:  Thank you.  I'm going to hear you out,

12   Mr. Jastrow, on the fiduciary duty and breach of contract

13   claim.

14        MR. JASTROW:  Thank you, your Honor.  Yes, I will try

15   to be very brief and cut this down a little bit.

16        So just on fiduciary duty, to start there, our first

17   point is that the complaint fails to plead any facts that would

18   impose a fiduciary duty on Hilary Kao to Onyx.

19        THE COURT:  Why doesn't general counsel have fiduciary

20   duty, duty of loyalty and care and good faith?

21        MR. JASTROW:  So that does seem to be what the

22   plaintiff rests their argument on, your Honor.  However,

23   Delaware law specifically says that simply being the lawyer for

24   an entity does not impose fiduciary duties on that lawyer to

25   the entity.  Even though it might impose some sort of ethical

N1CConyO.

obligation, it does not impose a fiduciary duty.  The

opposition, plaintiff's opposition does not really seem to

challenge this and instead pegs their argument to claiming that

by virtue of Mr. Kao being Onyx's general counsel, he was also

an officer of Onyx.

Now the term, they do not allege in the complaint that

Mr. Kao was an officer or that the general counsel position was

an officer position at the company.  In the opposition,

plaintiff does point out that Mr. Kao handled certain important

matters for Onyx, but simply handling important matters does

not make Mr. Kao an officer of Onyx.  In fact, under the Onyx

limited partnership agreement, there is a specific mechanism by

which officers can be designated.  I'm speaking of section

9.3B(v) of Onyx's LPA agreement, which says employees and

agents of Onyx may be designated as officers of the company.

However, the complaint never alleges that Mr. Kao was so

designated.  The LPA does specifically create one officer

position, and that is the officer position of CEO, but nowhere

in the LPA agreement is the position of general counsel

designated as an officer or is Mr. Kao designated as an

officer.

Section 9.3J of the LPA says that the management team

of the partnership shall initially be comprised of those

individuals set forth on schedule 6.  Note the LPA says

individuals and not officers.  So Hilary is listed as general

N1CConyO.

1    counsel on schedule 6, but he is not listed as an officer.

2              Now, if you look at Mr. Kao's employment agreement,

3    this also gives no indicia that Mr. Kao would be an officer of

4    Onyx.  To the contrary, he's an at-will employee of Onyx, he's

5    free to resign at any time for any reason or no reason.  The

6    company can terminate him at any time, with or without cause,

7    and with or without notice.  The contract was initially for a

8    limited six-month term and nowhere in Mr. Kao's employment

9    agreement or confidentially agreement does the word "officer"

10   appear.

11             THE COURT:  Just to be clear, are you saying there was

12   a disclaimer of his fiduciary duties in the employment contract

13   or you're just saying he never had any fiduciary duty to begin

14   with?

15             MR. JASTROW:  I think that those are two distinct

16   arguments, your Honor.  So I am saying that no default Delaware

17   fiduciary duties arose by virtue of Mr. Kao's employment by

18   Onyx as a lawyer, and no fiduciary duties arose due to any

19   designation of Mr. Kao as an officer because there is no

20   allegation in the complaint that he was so designated as an

21   officer, and none of the documents, including the LPA and the

22   employment agreement, which are integral to the complaint, in

23   any way indicate that Mr. Kao is an officer.

24             So with respect to the LPA and employment agreement

25   aggregating those fiduciary duties, that is a point to the

N1CConyO.

```
1    exculpatory provision in the LPA.  So if the Court did find,
2    which we don't think it should, that, from somewhere, fiduciary
3    duties arose that Hilary Kao owed to Onyx, there is specific --
4    or the default fiduciary duties that apply under Delaware law
5    would apply to Mr. Kao.  There is specifically an exculpatory
6    provision in the LPA that would disclaim those fiduciary
7    duties.
8            So Delaware law is very clear that limited liability
9    partnerships are allowed to basically disclaim any fiduciary
10   duties if they so choose.  I'm looking at 6 Delaware C Section
11   17-1101(f).  So very clear under Delaware law that limited
12   partnerships can disclaim fiduciary duties that are owed to
13   them.
14           Now, the Onyx LP agreement clearly disclaims those
15   fiduciary duties in an exculpatory provision, which is section
16   9.10(b)(iv).  That provision says whenever an indemnity is
17   permitted or required to make a decision or take an action with
18   an express standard of behavior, then such indemnity shall
19   comply with such express standard, but to the maximum extent
20   permitted under applicable law shall not be subject to any
21   other or additional standard imposed by this agreement or
22   applicable law.
23           So the triggers for this exculpation provision are,
24   first, that Mr. Kao be an indemnity, and there is a bit of a
25   logic and assertion of definitions and putting them together
```

N1CConyO.

1    that we explain in our opening papers, and I don't think the

2    opposition disputes that Mr. Kao is an indemnity.  So he is

3    covered by this exculpation provision if there is an express

4    standard of behavior that he is required to abide by.

5            And if you look at Mr. Kao's confidentiality

6    agreement, which is Exhibit 2 to my colleagues' declaration,

7    section 7 states:  In consideration for employment and

8    continued employment by the company, the employer will

9    faithfully and to the best of their ability perform and render

10   such services and such duties for the company as the company

11   may reasonably request.

12           So "faithfully and to the best of their ability to

13   perform" is an express standard of behavior that therefore

14   causes the exculpation provision of the LPA to kick in and

15   replace any default fiduciary duties that Mr. Kao would owe,

16   assuming he did owe any fiduciary duties to Onyx, with that

17   express standard of behavior, that contractual standard of

18   faithfully and to the best of his ability to perform.

19           So the opposition argues that any exculpation

20   provision must be clear and unambiguous, and they take aim at

21   this language from the confidentiality agreement, this express

22   standard of behavior of faithfully and to the best of their

23   ability to perform and claim that that is not sufficiently

24   clear and unambiguous.

25           First of all, plaintiff has turned the argument on its

N1CConyO.

1    head.  What needs to be clear and unambiguous is the

2    exculpation provision in the LPA agreement, which, really, I

3    don't see how it could be clearer.  Very clearly says,

4    indemnity shall comply with such express standard of behavior

5    to the maximum extent permitted under applicable law and shall

6    not be subject to any other or additional standard imposed by

7    this agreement or applicable law.  So it seems to me to be very

8    clear and unambiguous that the LPA is, by this language,

9    exculpating any fiduciary who is held to a contractual express

10   standard of behavior from the default Delaware fiduciary

11   duties.

12       Now, the opposition also takes issue with defendant's

13   characterization of faithfully and to the best of their ability

14   as an express standard of behavior that would trigger the

15   exculpation provision in the LPA.  But as defendant's

16   opposition points out, the LPA specifically gives examples of

17   what would be considered an express standard of behavior, and

18   those examples include reasonable and good faith.

19       Now, reasonable and good faith are very analogous to

20   faithfully and to the best of their ability.  So there really

21   is no argument that reasonable and good faith could be

22   expressed standards, but faithfully and to the best of their

23   ability would not be.

24       THE COURT:  Thank you very much.  Any response from

25   plaintiff?

N1CConyO.

1          MR. JACOBS:  Yes, your Honor.

2          THE COURT:  Why don't you delve right into the

3     exculpation provision that was mentioned by counsel.

4          MR. JACOBS:  You don't want me to address whether

5     general counsel --

6          THE COURT:  You can, but do it briefly.

7          MR. JACOBS:  I'll do it very briefly.  I'm surprised

8     we're addressing that issue, but I agree that simply being a

9     lawyer does not make one a fiduciary, but being the general

10    counsel of a company does.  I would point to the factual

11    allegations at complaint 17, paragraph 17 to paragraph 22, and

12    Delaware law addresses this issue.  There's a case, it's not

13    cited in the papers, but we found it after the reply brief was

14    filed, called in Re: World Alternatives 385 BR 576 where

15    general counsel made justice argument, the court swiftly

16    rejected it, cited a law review article that says in addition

17    to their professional obligations, general counsel owes

18    fiduciary duties.

19          So let me get into the exculpatory argument.

20          Delaware law makes clear that, yes, a partnership can

21    waive fiduciary duties for a person, but for good reason, that

22    waiver has to be clear and unambiguous.  Now, Mr. Kao says it

23    is clear and unambiguous, but I would point your Honor to the

24    MKE Holdings case because it really answers this question, and

25    it's a case cited by Mr. Kao.  There, the operating agreement

N1CConyO.

1    did clearly and unambiguously waive fiduciary duties for the

2    members.  It said to the fullest extent permitted under the LLC

3    law, the members of Verdesian hereby waive any fiduciary duty

4    of the managers so long as such person acts in a manner

5    consistent with the operating agreement.  That's at MKE

6    Holdings at page 9.  There's no language like that in the LPA.

7    The LPA simply says that indemnities are required to act with

8    an express -- consistent with an express standard if one is

9    given.

10            Now, this issue with the employment agreement, first

11   of all, there's two triggers to waive fiduciary duty liability.

12   One is you have to clearly and unambiguously have in the

13   agreement an intent to waive that, but two, the standard that

14   you're referring to, the contractual standard, for lack of a

15   better term, has to be irreconcilable with the fiduciary duty

16   so they can't exist together.  That case is RSM Inc. v.

17   Alliance Capital.  It says fiduciary duties will only be

18   displaced if the contract and the default fiduciary duties

19   cannot be reconciled.

20            Here, in Mr. Kao's case, you're talking about complex

21   partnership agreements, operating agreements.  Here, Mr. Kao

22   says, well, Onyx intended to waive that fiduciary duty to me

23   through my employment agreement, and the provision of his

24   employment agreement that he cites to is a moonlighting

25   provision that basically says you have to devote your hours,

N1CConyO.

1    working hours to the company and you have to do that

2    faithfully.  That's totally consistent with the duty of good

3    faith, totally consistent.  There is nothing irreconcilable

4    between language and his moonlighting provision and the duty of

5    good faith.

6            Your Honor, if you like, I could address whether the

7    fiduciary duty claim is duplicative of the contract claim.

8            THE COURT:  I don't think so.

9            MR. JACOBS:  I appreciate that, your Honor.

10           THE COURT:  Thanks very much.  Last word, Mr. Jastrow.

11           MR. JASTROW:  Yes, very briefly.  To address

12   Mr. Jacobs's point about general counsel having fiduciary

13   duties, look, the LP -- the context of limited partnerships are

14   very different from corporate law.  The LPA is really the

15   beginning and the end of who owes fiduciary duties and who is

16   an officer.  So we are aware of no case that says general

17   counsel is somehow automatically an officer of a limited

18   partnership or that they are somehow owed fiduciary duties.

19   Again, the beginning and the end of who owes fiduciary duties

20   and who is an officer is the LP agreement, and the Onyx LP

21   agreement does not, as I explained earlier, make Hilary Kao an

22   officer and does not impose fiduciary duties.

23           Now, with respect to --

24           THE COURT:  Just step back for a second.  Here, the

25   complaint alleges that Mr. Kao is one of the key managerial

N1CConyO.

1    personnel of the company, and there is Delaware case law I'm

2    going to cite, for example, the Beard case, 8 A.3d 573, 601,

3    which said, among other things, that based on defendant's title

4    and high ranking position at the company, that defendant was

5    both an officer and one of the key managerial personnel of the

6    company and therefore owed the company a fiduciary duty.

7         MR. JASTROW:  Yes, your Honor, the Beard case is

8    completely distinguishable from the circumstances here.  So, in

9    that case, the court first found that the defendant was a

10   director of the plaintiff corporation — it was a corporation,

11   not a limited partnership — and that as a director of that

12   corporation, he owed fiduciary duties.  The court went on, and

13   this is the passage of the case that the opposition seizes upon

14   and says, just like you said, that by the nature of his high

15   ranking position, the court was going to consider him an

16   officer.

17        Now, the defendant in that case was, and I believe the

18   quotation from the opinion says, second in command of the

19   company.  Now that is in no way analogous to Mr. Kao, who was

20   Onyx's in-house counsel.  He was not second in command of the

21   company.  And again, this is in the corporate context of the

22   Beard case and not the limited partnership context.

23        Now, with respect to the exculpation provision point

24   that Mr. Jacobs made, it's simply just an incorrect statement

25   of law that the standard imposed by the exculpation provision

N1CConyO.

1    has to be completely irreconcilable with the default duties

2    under Delaware law.  I believe the case that is cited in the

3    opposition for this is the RSM case, which doesn't even deal

4    with an exculpation clause and is completely inapposite.

5         Just to conclude here, one of the reasons why this

6    fiduciary duty claim is of particular importance to Mr. Kao is

7    because, as far as indemnification goes, the sole reason that

8    Onyx is providing for refusing to honor the indemnification

9    agreement and provide for Mr. Kao defense costs is due to this

10    allegation that he breached a fiduciary duty.  So just would

11    like to point out that this fiduciary duty claim is of

12    paramount importance to Mr. Kao.

13         THE COURT:  Thank you, all.  I'm going to ask you to

14    order the transcript as quickly as you can and I will try and

15    move promptly.

16         MR. COOGAN:  Your Honor, can we just address one minor

17    thing.  Your Honor, I apologize that we have not tied this

18    issue up for you after submitting a couple of letters.  We have

19    the stipulation on adjourning discovery, and we anticipate, I

20    think, submitting that relatively --

21         THE COURT:  Okay.  Thank you.

22                        *  *  *

23

24

25